**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HERITAGE HANDOFF HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| RONALD FONTANELLA, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Heritage Handoff Holdings, LLC ("Plaintiff" or "Heritage"), by and through its counsel, Potter Anderson & Corroon LLP and Brown Rudnick LLP, alleges for its complaint against Defendant Ronald Fontanella ("Defendant" or "Fontanella") as follows:

**INTRODUCTION**

1.      This action concerns Defendant Fontanella's breach of contract and fraudulent misrepresentations and omissions in connection with the sale of his company to Heritage.

2.      On July 31, 2015, Plaintiff Heritage and Defendant Fontanella entered into a Stock Purchase Agreement (the "Agreement"), pursuant to which Heritage acquired from Fontanella all issued and outstanding shares of stock in the J.J. Ryan Corporation, a Connecticut corporation (the "Company"), which, operating under the name Rex Forge, specializes in the manufacture of forged steel components used primarily in the automotive industry.

3.      To induce Plaintiff into acquiring the Company for substantially more than it was worth, Defendant Fontanella blatantly misrepresented or otherwise failed to disclose material facts about the Company's relationships with its largest customers, the condition of its machinery and equipment, and its finances and operations, among other things.

4.      Prior to the sale, however, Defendant Fontanella was aware, *inter alia*, that the Company's two largest customers had materially reduced their business with the Company due to pre-closing complaints and issues concerning quality, reliability, and delivery, and that the Company's critical machinery and equipment was in poor working condition.

5.      Rather than responding honestly to Heritage's multiple inquiries and requests, or otherwise disclosing these issues, Defendant Fontanella attempted to cover his tracks and conceal many of his most egregious lies and omissions by deleting and expunging incriminating Company records, which revealed the Company's then deteriorating state of affairs.

6.      Had Plaintiff known the truth about the Company, it would not have entered into the transaction, or would have done so for a dramatically lower purchase price.

## PARTIES

7.      Plaintiff Heritage is a Delaware limited liability company with a principal place of business at 555 West Fifth Street, 35th Floor, Los Angeles, California, 90013.

8.      Defendant Fontanella is a citizen of the state of Connecticut with, upon information and belief, an address at 59 North Court, Meriden, Connecticut 06450.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 by virtue of the fact that this action raises claims under Sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.      In addition, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 by virtue of the fact that this action is between, on the one hand, Plaintiff

Heritage, a citizen of Delaware and California and, on the other hand, Defendant Fontanella, a citizen of Connecticut, with an amount in controversy in excess of $75,000.

11.     Venue is proper in this Court because Defendant Fontanella irrevocably consented to the jurisdiction and venue of this Court pursuant to Section 7.8 of the Agreement.

## FACTUAL BACKGROUND

### I.     The Company's Operations

12.     At the time of the transaction, the Company, operating under the name Rex Forge, was marketed as a leading provider of high quality, specialized forged steel components.

13.     The Company operates out of one complex in Plantsville, Connecticut, which houses both its financial and administrative offices, as well as its manufacturing facility.  Prior to the sale, Rex Forge operated with a lone email account through AOL.

14.     The Company serves customers primarily in the automotive industry, who require critical "cannot fail" steel parts that are used in high-stress areas such as a vehicle's driveshaft.

15.     These customers place orders for the Company to manufacture certain parts, which are designated by a specific alpha-numeric part number.

16.     At the time of the transaction, the Company's customer base was highly concentrated in a few customers in the automotive industry.

17.     To manufacture these critical steel parts, the Company mainly relies on six large mechanical presses, which range in size from approximately 1500 tons to 4000 tons, along with related machinery.

18.     Once the Company has manufactured the respective parts, the Company then delivers the parts to certain domestic and international customer locations.  Thereafter, the

customer incorporates the Company's parts into larger sub-assemblies which, typically, are then shipped to the customer's own customers, *i.e.*, large automobile manufacturers.

## II.    Defendant Fontanella's Complete Ownership And Control Of The Company

19.    Defendant Fontanella originally was hired as the Company's controller in 1975, and then became its chief financial officer in 1977.

20.    By the mid-1980's, Defendant Fontanella had assumed the role of the Company's president and chief executive officer, as well as its majority owner.  During this time, Defendant Fontanella continued to serve in the role of the Company's chief financial officer rather than hiring and training a replacement controller and/or chief financial officer.

21.    By 2007, Defendant Fontanella was the Company's sole director.

22.    At the time of the transaction, Defendant Fontanella had acquired 100% of the issued and outstanding shares of the Company.

23.    During all relevant times, Defendant Fontanella had intimate knowledge of, and exercised complete control over, the Company's operations and finances, including its lone "AOL" email account.

## III.    Defendant Fontanella Decides To Sell The Company

24.    In 2014, Defendant Fontanella retained an investment bank to market the Company for sale to a new owner or ownership group.

25.    As a result of that initiative, Defendant's representatives solicited Plaintiff Heritage and its representatives to discuss a potential acquisition of the Company.

26.    Over the course of the next several months, Plaintiffs' representatives met with Defendant Fontanella to conduct due diligence into the Company's operations and finances.

27.     As a result of the Defendant's representations, described below, Plaintiff Heritage was induced into entering into the Agreement to purchase the Company on July 31, 2015.

28.     For the next several months post-closing, Defendant Fontanella remained at the Company to assist in the transition of ownership.

## IV.   After Closing, Heritage Discovers Defendant Fontanella's Fraud

### a.   Fontanella Mispresents and Intentionally Conceals the Company's Deteriorating Customer Relationships.

29.     As alleged above, the Company's customer base was highly concentrated in a few customers in the automotive industry.

30.     As a result of this high customer concentration, Plaintiff Heritage made numerous inquiries to Defendant Fontanella concerning the nature, scope, and strength of those relationships.

31.     In response, Defendant Fontanella fraudulently represented, *inter alia*, that the Company had a "stable and loyal" customer base due, in part, to the Company's "superior" quality and customer service, that the Company never had any quality issues that would drive a customer to look for alternative suppliers, and further, that the Company had never lost existing business to a competitor.

32.     In response to direct inquiries in due diligence meetings with Heritage, Defendant Fontanella specifically represented that "everything is fine" with the Company's largest customer relationship.

33.     In Section 2.13 of the Agreement, Defendant Fontanella further made an express representation and warranty to Plaintiff Heritage that:

> No such customer has within the last twelve (12) months
> (i) cancelled, materially decreased or otherwise modified, or to the
> Shareholder's Knowledge, threatened to cancel, materially
> decrease or otherwise modify its relationship with the Company,

(ii) materially delayed or postponed any payment owed to the
Company or (iii) notified the Shareholder or the Company of any
dispute of any nature.

34.     Defendant Fontanella's representation and warranty in Section 2.13 was so
critical to inducing Plaintiff to acquire the Company that it was designated as one of the "Core
Reps" in the Agreement and further that any breach thereof by Defendant Fontanella would not
be limited by the Indemnification Cap, as otherwise applicable under the contract.

35.     In reality, Defendant Fontanella's oral and written representations concerning the
Company's key customer relationships were outright lies.

36.     Prior to the closing, the Company's top customers were making constant oral and
written complaints to the Company and Defendant Fontanella about the Company's serious
deficiencies in terms of the quality of the manufactured parts and on-time delivery.

37.     For example, in the months prior to closing, the customers notified the Company
and Defendant Fontanella that the Company was "putting customers at risk with all these late
delivery dates," and that the Company "will be responsible for any shutdown."

38.     These issues had become so severe that the customers notified the Company and
Defendant Fontanella that they had been elevated up to the customer's own customers, *i.e.*, the
large automobile manufacturers, who were "very concerned" with the Company's deficiencies.

39.     As a result of these complaints, prior to closing, the customers informed the
Company and Defendant Fontanella that they would charge the Company for, among other
things, the costs associated with shutting down the customer's production lines, sorting out
defective parts, and expediting the delivery of late parts to customer plant locations.

40.     Importantly, the customers also notified the Company and Defendant Fontanella
that they were re-sourcing the manufacture of critical parts to other suppliers due to issues and
concerns over the Company's poor quality, reliability, and on-time delivery.

41.     Specifically, on May 12, 2015, the Company's top customer complained that the Company's problems "could potentially become a global issue."  Three days later, on May 15, 2015 (a month and a half prior to the signing of the Agreement), the Company's top customer officially notified Defendant Fontanella orally and by email confirmation to the "AOL" account that they were resourcing the manufacture of certain specific parts to another supplier, which included several of the most profitable parts that the Company manufactured.

42.     Rather than disclosing this dramatic event to Plaintiff, Defendant Fontanella first attempted to prohibit Heritage from calling the customer during due diligence prior to closing. Having eventually relented, Defendant Fontanella intentionally limited Heritage's access to a lower level customer employee and kept Heritage in the dark about the customer's executives who had recently notified Defendant of their decision to cease purchasing certain parts from the Company and, instead, had elected to re-source those parts to one of the Company's competitors.

43.     Incredibly, a post-closing investigation revealed that the customer's pre-closing email notification confirming the loss of business and resourcing of these parts to another supplier had been deleted and expunged from the Company's "AOL" email account.

44.     Upon information and belief, Defendant Fontanella, who had control over the Company's lone "AOL" email account, deleted and expunged, or caused to be deleted and expunged, the customer's confirmation email as part of his failed effort to cover his tracks and conceal this massive red flag and fraud from Plaintiff.

45.     Likewise, prior to closing, the Company's second largest customer had notified the Company and Defendant Fontanella that they were also resourcing one of the most profitable parts to other suppliers and had dramatically decreased their relationship with the Company.

46.     Prior to closing, Defendant Fontanella did not disclose the foregoing to Heritage.

**b.      Fontanella Misrepresents the Condition of the Company's Equipment**

47.      As alleged above, the Company's entire manufacturing processes rely on the operation of its large mechanical press machines, along with various tooling and dies, which together forge the steel parts into raw castings.

48.      During the sale process, Defendant Fontanella made numerous oral and written representations concerning the Company's machines and equipment, including its mechanical presses, namely, that they were in good working condition, were "well-maintained," and provided an "efficient manufacturing platform capable of sustaining future growth."  Defendant Fontanella further represented that there would not be any "major capital expenditure needs as most equipment and infrastructure upgrades and improvements have already been made."

49.      In Section 2.7 of the Agreement, Defendant specifically represented and warranted that the Company's assets were in "good working condition" and were "sufficient to permit the Company to conduct its business after the Closing in accordance with past practice."

50.      These representations were also untrue as several of the Company's critical presses had to be shut-down due to major repair issues in the days prior to closing, which Defendant Fontanella concealed from Plaintiff.

51.      In fact, almost immediately after Closing, and in an "unprecedented" situation as admitted by Defendant to Plaintiff during his brief post-closing transition, the Company was forced to take a total of four presses offline to address critical maintenance issues resulting from the failure to properly maintain and repair the equipment prior to the Closing.

52.      In addition, the Company's other critical assets, such as key tooling and dies, had also not been properly maintained and were not in good working condition.  Indeed, the poor

condition of the Company's machinery and equipment pre-closing was a cause of the deteriorating customer relationships alleged above.

53.     The true condition of the Company's equipment has required, and will continue to require, expensive repairs and rebuilds, as well as the costs of shifting work to other machines.

      c.     **Fontanella Misrepresents the Company's Finances**

54.     As alleged above, Defendant Fontanella has acted as the Company's chief financial officer in 1977 and, since that date, has exerted sole control and responsibility over the Company's finances.

55.     At all relevant times prior to closing, the Company self-insured to cover any medical claims submitted by its employees.  As a result of being self-insured, in its financial records, the Company had to accrue for and pay all such qualifying employee medical claims.

56.     As part of the due diligence process, Defendant Fontanella provided Plaintiff Heritage and its' representatives with copies of the Company's financial statements for the periods as of November 1, 2014 and again as of June 30, 2015.

57.     In the Agreement, Defendant Fontanella further represented that these financial statements "fairly present the financial position, results of operations and changes in equity of the Company in all material respects" and further that the financial statements "have been prepared in accordance with GAAP…."

58.     After the closing, Plaintiff discovered that the representations and warranties were false as the Company had failed to pay, or accrue for, significant medical claim liabilities dating as far back as 2012, which included a claim concerning a deceased employee.

59.     Prior to closing, Defendant Fontanella did not disclose these liabilities to Heritage.

**d.      Fontanella Misrepresents Issues with Key Employees**

60.      In the Agreement, Defendant Fontanella represented, among other things, that there were "no material controversies" between the Company and any Employee" and further that "[n]o Employee has notified the Shareholder or the Company that he or she will terminate his or her employment following the Acquisition."

61.      In addition, Defendant Fontanella represented that the Company had not incurred any liabilities or obligations to any person, nor had the Company made or granted any increase in the bonuses payable to any employees.

62.      In reality, Defendant Fontanella was aware that significant controversies existed with several critical employees, including one employee who was suffering from a substance abuse problem, including during work hours, and another employee who Fontanella promised – but did not pay – a substantial bonus.

63.      Prior to closing, Defendant Fontanella did not disclose these issues to Heritage.

64.      In sum, if Plaintiff Heritage had known the true condition of the Company's customer relationships, operations, and finances, Heritage would not have purchased the Company or would have done so based on a dramatically lower purchase price.

65.      Instead, shortly after closing, Heritage was forced to infuse even more capital into the Company in order to maintain its operations.

**COUNT ONE**
**(BREACH OF CONTRACT)**

66.      Plaintiff incorporates Paragraphs 1 through 65 as if specifically alleged herein.

67.      The parties entered into a valid and enforceable contract.

68.      As set forth above, Defendant Fontanella has breached, *inter alia*, Sections 2.6, 2.7, 2.13, 2.17, and 2.24 of the Agreement.

69.     Plaintiff has fully performed its obligations under the Agreement.

70.     As a result of Defendant Fontanella's breaches of the Agreement, Plaintiff Heritage has suffered damages in an amount to be proven at trial, not including interest.

71.     In addition, under the Agreement, Plaintiff is entitled to its "reasonable expenses, including court costs and reasonable attorneys' and other professional' fees and expenses, including "any other costs of enforcing an Indemnified Party's rights under this Agreement…."

## COUNT TWO
## (VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5)

72.     Plaintiff incorporates Paragraphs 1 through 71 as if specifically alleged herein.

73.     As alleged above, and at all times relevant to this matter, Defendant Fontanella disseminated or approved the false statements specified above, which he knew were misleading (or deliberately disregarded) and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendant Fontanella violated § 10(b) of the Exchange Act and Rule 10b-5 by directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce or of the mails, knowingly or with reckless disregard for the truth:

      a.     employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Heritage in connection with its purchase of the Company.

75.     Heritage has suffered damages in that, in reliance on the representations made by Defendant Fontanella and his failure to disclose the true facts, it paid an artificially inflated price for the stock of the Company and was damaged thereby.

76.     At the time the foregoing material misrepresentations and omissions were made, Heritage was unaware of their falsity, and believed them to be true.  Had Heritage known the truth regarding the nature of the Company's customer relationships, operations, and finances, as alleged above, Heritage would not have purchased the shares of the Company.

77.     As a direct and proximate result of Defendant's wrongful conduct, Heritage suffered damages in connection with its purchase of the Company's stock.

**COUNT THREE**
**(COMMON LAW FRAUD)**

78.     Plaintiff incorporates Paragraphs 1 through 77 as if specifically alleged herein.

79.     As alleged above, Defendant Fontanella made written and oral false representations of material fact (and failed to disclose material facts) with knowledge that those so-called facts were false, or with reckless indifference to their truth.

80.     Defendant Fontanella's actions or inactions were made with an intent to induce Plaintiff  Heritage to purchase the Company

81.     Plaintiff Heritage purchased the Company in justifiable reliance upon Defendant Fontanella's written and oral misrepresentations and omissions.

82.     As a direct and proximate result, Heritage has suffered damages.

83.     In addition, Defendant Fontanella's conduct, including his blatant lies and omissions, and his intentional destruction and concealment of incriminating emails, was sufficiently malicious and wanton to entitle Plaintiff to an award of punitive damages.

## COUNT FOUR
## (VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT)

84.     Plaintiff incorporates Paragraphs 1 through 83 as if specifically alleged herein.

85.     At all relevant times, Defendant Fontanella was a resident of the State of Connecticut, and the owner of the Company, a Connecticut corporation.

86.     In addition, the majority of the due diligence concerning the transaction took place within the State of Connecticut, and the Defendant's misrepresentations, and unfair and deceptive trade practices, were devised and disseminated from the State of Connecticut.

87.     As alleged above, Defendant Fontanella's unfair and deceptive trade practices are a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 41-110 *et seq.*

88.     Defendant Fontanella's conduct, including his blatant lies and omissions, and his intentional destruction and concealment of incriminating emails, offends public policy, is immoral, unethical, oppressive, and/or unscrupulous, and caused substantial injuries to Plaintiff.

89.     At all times, Defendant Fontanella acted with reckless indifference to the rights of Plaintiff or an intentional and wanton violation of those rights and without justification.

90.     Plaintiff has suffered an ascertainable loss as a result of Defendant Fontanella's unfair and/or deceptive method act or practice.

91.     Plaintiff further seeks an award for its costs, attorney's fees, and punitive damages.

## COUNT FIVE
## (DECLARATORY JUDGMENT)

92.     Plaintiff incorporates Paragraphs 1 through 91 as if specifically alleged herein.

93.     As set forth above, Defendant Fontanella has materially breached Sections 2.6, 2.7, 2.13, 2.17, and 2.24 of the Agreement.

94.     As a result of the foregoing, Defendant Fontanella has an obligation pursuant to Section 6.1 *et seq.* of the Agreement to indemnify and hold harmless the Purchaser Indemnified Parties (as that term is defined in the Agreement) from and against, and compensate, reimburse, and pay the Purchaser Indemnified Parties for, any and all Damages (as that term is defined in the Agreement) arising out of or relating to, *inter alia*, any inaccuracy in or breach of any representation or warranty made by the Company or the Defendant Fontanella in the Agreement.

**WHEREFORE**, Plaintiff Heritage requests judgment against Defendant Fontanella, awarding Plaintiff the following relief:

a)      Compensatory and consequential damages in an amount to be proven at trial;

b)      Punitive damages in an amount to be proven at trial;

c)      A declaratory judgment that Defendant Fontanella has an obligation pursuant to Section 6.1 *et seq.* of the Agreement to indemnify and hold harmless the Purchaser Indemnified Parties from and against any and all Damages;

d)      Pre- and post-judgment interest;

e)      Its reasonable costs and expenses, including attorneys' fees and other professional's fees and expenses, as well as pre- and post-judgment interest; and

f)      Any other and further relief as the Court may deem just and proper.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:                                  By:   _/s/ John A. Sensing_____
                                                      John A. Sensing (No. 5232)
Dylan P. Kletter                                      Hercules Plaza, Sixth Floor
(*pro hac vice* pending)                              1313 North Market Street
BROWN RUDNICK LLP                                     Wilmington, Delaware  19801
185 Asylum Street, CityPlace I                        Telephone: (302) 984-6000
Hartford, CT  06107                                   Facsimile: (302) 658-1192
Telephone: (860) 509-6557                             Email: jsensing@potteranderson.com

                                             *Attorneys for Plaintiff*
Dated:  August 10, 2016                      *Heritage Handoff Holdings, LLC*
[1230976 / 43521]