IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HERITAGE HANDOFF HOLDINGS, LLC,

Plaintiff,

v.

RONALD FONTANELLA,

Defendant.

Civil Action No. 1:16-cv-00691-RGA

## MEMORANDUM OPINION

John A. Sensing, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Dylan P. Kletter & Kelsey D. Bond, BROWN RUDNICK LLP, Hartford, CT.

Attorneys for Plaintiff.

Dominick T. Gattuso & Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; Marc J. Kurzman & Peter M. Nolin, CARMODY TORRANCE SANDAK & HENNESSEY LLP, Stamford, CT; Damian K. Gunningsmith, CARMODY TORRANCE SANDAK & HENNESSEY LLP, New Haven, CT.

Attorneys for Defendant.

March 6., 2019

ANDREWS, U.S. DISTRICT JUDGE:

At issue in this case is the July 31, 2015 sale of Rex Forge ("Rex") from Ronald Fontanella to Heritage Handoff Holdings, LLC ("Heritage"). Rex manufactures forged steel parts, primarily for the automotive industry. Prior to the sale, Mr. Fontanella served as CFO, CEO, and owner of Rex. (D.I. 157-60 ("Tr.") at 14:4-15). CounterPoint Capital Partners ("CounterPoint") and Carlin Capital ("Carlin") formed Heritage, a Delaware LLC, for the purpose of purchasing Rex. (Tr. 420:7-15). The Stock Purchase Agreement ("SPA") embodies the Parties' final deal regarding the sale. (PX 4).

Heritage brought this action on August 10, 2016 alleging breach of contract, securities fraud under Section 10(b) of the Exchange Act, common law fraud, and violation of the Connecticut Unfair Trade Practices Act. (D.I. 1 at ¶¶ 66-94). Mr. Fontanella counterclaimed seeking reformation of the SPA and alleging breach of contract. (D.I. 135 at CC ¶¶ 48-69). I held a four-day bench trial on August 13-16, 2018. The Parties have since fully briefed the issues addressed at trial and provided me with joint proposed post-trial findings of fact. (D.I. 168, 169, 170, 172, 173, 174, 175).

## I. BACKGROUND

Rex manufactures forged steel components for automotive industry customers. It is considered a "Tier 2" parts supplier. (Tr. 55:15-25). Rex ships its forgings to Tier 1 suppliers such as Dana and Hendrickson for additional processing. (Tr. 54:7-12). Tier 1 suppliers provide parts to Original Equipment Manufacturers ("OEMs") such as Ford or Toyota. (Tr. 54:18-55:10). OEMs monitor Tier 1 and Tier 2 suppliers. (Tr. 395:24-396:7).

As of the signing of the SPA on July 31, 2015 ("Closing"), Rex did not have a diverse customer base—80 percent of Rex's business was concentrated in four Dana locations. (Tr. 15:14-18, 48:22-49:9). Rex's second largest customer was Hendrickson. (Tr. 135:15-20).

Heritage recognized the high customer concentration as a potential risk. (Tr. 709:7-21). During diligence, it made repeated inquiries to Mr. Fontanella about Rex's relationship with Dana. (Tr. 433:14-17). Heritage wanted to know "everything" Mr. Fontanella knew about Rex's customer relationships before Closing. (PX 89).

Mr. Fontanella consistently represented to Heritage that Rex's relationship with Dana was good. (Tr. 423:9-13, 708:8-15). It was not. During the relevant period, Rex received scorecards from Dana which consistently ranked Rex's quality as "poor" or "bad." (Tr. 290:8-17, 373:1-374:18, 399:9-15; PX 193). The scorecards were not available to the general public. (Tr. 522:3-8). Rex was also receiving daily phone calls from Dana, receiving urgent complaint emails from Dana, and undergoing regular onsite visits from Dana. (Tr. 60:7-16; PX 32; PX 33; PX 40). In May 2015, two senior Dana executives visited Rex to tell Mr. Fontanella in person that Dana was cancelling parts and sending them to a competitor. (Tr. 81:13-20, 350:25-351:17). A customer moving parts to a competitor was an exceedingly uncommon occurrence with only one other identified instance in nineteen years. (Tr. 87:16-25, 297:10-12). Mr. Fontanella did not disclose any of these issues to Heritage.

During diligence, Heritage sought to speak with someone from Dana to verify the stability of its relationship with Rex. (Tr. 436:15-18). Mr. Fontanella was not helpful and initially claimed he did not know to whom Heritage could talk. (Tr. 436:19-437:13). Mr. Fontanella eventually arranged a call with Dana employee Philip Alber during which Heritage presented itself as a consultant. (Tr. 437:23-24, 438:13-21). Mr. Alber had a high regard for Rex and had a good relationship with the company. (Tr. 1025:23-1026:22). However, Mr. Alber was a lower level employee and was not involved in Dana's purchasing decisions or quality issues. (Tr. 437:25-438:9, 931:23-932:3).

During the same period, Hendrickson was decreasing its volume of purchases of part number D-2700 ("the Spider"). (Tr. 123:9-13; 300:25-301:9). The Spider was Rex's highest revenue part. (Tr. 136:17-23; PX 196). Mr. Fontanella did not disclose any issues with Hendrickson to Heritage prior to Closing. (Tr. 115:4-9; PX 9).

Press cells are Rex's primary equipment. They have designations ranging from Press 42 to Press 52. (Tr. 151:15-17, 427:13-21). The press cells consist of a main press, a trim press, an induction heater, a conveyor, and cooling towers. (Tr. 151:18-152:13, 633:6-9). If any part of the press cell breaks down, the entire press cell is inoperable. (Tr. 633:11-15). At Closing, much of Rex's equipment was at least half a century old and had encountered "hard use." (DX 71 at HERITAGE4771-88). Heritage was aware that two of the presses were out of service at Closing. (PX 5 at REX24271).

Prior to Closing, Rex handled most maintenance in-house. (Tr. 158:2-6). It employed a full-time maintenance manager who managed six or seven employees. (Tr. 187:8-13). Rex's capital expenditures ranged from $650,000 to $700,000 per year between 2008 and 2013. (PX 7 at HERITAGE50). Pursuant to SPA § 2.24(a)(iv), Rex disclosed to Heritage each capital expenditure incurred during the diligence period that was greater than $25,000. (PX 5 at REX24317-18).

During diligence, Heritage had access to Rex's maintenance records, had access to Rex's employees, and toured Rex's facilities on numerous occasions. (Tr. 608:8-11, 688:25-689:6, 743:25-744:21, 745:9-20). Heritage also obtained an appraisal report from Great American. (DX 71). The report disclosed the equipment was in "fair" condition, which meant that the equipment "may require repair or refurbishment soon; appears to have seen extensive service; may be aged, have suffered hard use or may be visually unattractive to potential buyers." (*Id.* at

HERITAGE4771-88). Heritage recognized that, due to the age and condition of the equipment, "unexpected significant capital expenditures could be required to maintain or repair the forging press and hammers." (DX 95 at HERITAGE655).

At Closing, Heritage agreed to pay $12 million for Rex. (PX 4). Heritage paid Mr. Fontanella $8,393,065 in cash, which was reduced in March 2016 to $7,886,065 by certain net working capital adjustments, and a $2,500,000 Note, which was payable to Mr. Fontanella over the next five years. (PX 107; DX 137). Under the Note, Heritage and Rex agreed to pay Mr. Fontanella $79,538 quarterly, for twenty quarters, with the remaining balance due on July 31, 2020. (PX 4 at REX24364). These payments are subject to certain set-off rights under Section 6.6 of the SPA and certain environmental funding provisions under Exhibit B to the SPA. (*Id.*).

Post-Closing, Rex's maintenance department changed dramatically. The long-term maintenance director and the electrician left the company. (Tr. 248:14-249:22, 511:19-512:1). Between Closing and June 2016, the Director of Manufacturing and Engineering, another long-term Rex employee who ultimately left the company, supervised maintenance. (Tr. 306:25-307:1). In June 2016, Rex promoted a recently hired employee to handle maintenance. (Tr. 627:19-628:2). Moreover, Rex did not have a preventive maintenance plan. (Tr. 938:20-24, 944:3-7). Rather, Heritage ran the equipment until it needed to be repaired. (Tr. 685:4-17). Indeed, even with known mechanical problems and no skilled in-house maintenance department, Heritage ran some equipment until it failed. (Tr. 689:7-690:7).

In October 2015, Plaintiff defaulted on its loan agreement with Wells Fargo. (Tr. 729:18-730:1; PX 105).

## II.    PLAINTIFF'S FRAUD CLAIMS

### A.    Legal Standard

In Delaware, to establish a common law fraud claim a plaintiff must prove: (1) a false representation by the defendant; (2) the defendant's knowledge of or reckless indifference to the falsity of the representation; (3) the defendant's intent to induce the plaintiff to act; (4) the plaintiff's actions taken in justifiable reliance on the false representation; and (5) damages stemming from the plaintiff's reliance. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). A finding of fraud does not require finding an overt misrepresentation. Fraud can occur "through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Id.*

Federal securities fraud is similar to Delaware common law fraud. To establish a claim of federal securities fraud a plaintiff must prove: (1) the sale of a security from the defendant to the plaintiff; (2) a false representation or omission of material fact by the defendant; (3) the defendant's intent to deceive, manipulate, or defraud (often referred to as scienter); (4) the plaintiff's actions were taken in justifiable reliance on the defendant's representation or omission; and (5) damages stemming from the plaintiff's reliance. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009).

### B.    Relevant Factual Findings

1. Dana was Rex's largest customer at Closing, accounting for 80% of Rex's business. (Tr. 49:7-9).

2. In May 2015, Dana representatives Vyas Harsh and Phil Molyet informed Mr. Fontanella that Dana was moving parts from Rex. (Tr. 81:13-23, 350:25-351:17).

3. Sometime prior to July 8, Hendrickson informed Mr. Fontanella that it was delaying orders of the Spider from Rex. (Tr. 123:3-13).

4. Mr. Fontanella learned on June 8, 2015 that Rex was losing Dana's Toyota Tacoma program, Part #5002961. (Tr. 99:2-6; PX 56).

5. Mr. Fontanella did not inform Heritage of lost parts prior to Closing. (Tr. 124:10-125:25, 1068:6-25).

6. Heritage knew it was purchasing an old business with 1950s era equipment. (Tr. 516:9-16; PX 7 at HERITAGE25).

7. Heritage was aware that older equipment may unexpectedly require large capital expenditures for repairs. (DX 71 at HERITAGE4756).

8. Heritage was on notice that the equipment was in "fair working order." (*Id.*). This meant that it "[m]ay require repair or refurbishment soon" and may have "suffered hard use." (*Id.* at HERITAGE4771).

9. Heritage changed the maintenance regime immediately after Closing. (Tr. 247:18-248:22).

## C. Discussion

Plaintiff argues that Mr. Fontanella committed fraud via representations or material omissions he made related to (1) Rex's customers and (2) Rex's equipment. I will consider each set of representations in turn. First, however, I will address Mr. Fontanella's defenses to the fraud claims.

### 1. Mr. Fontanella's Affirmative Defenses

Defendant argues that Plaintiff contractually waived its right to rely on any extra-contractual representation made by Mr. Fontanella. It bases its argument on "anti-reliance" provisions of the Parties' pre-negotiation Confidentiality Agreement and of the SPA.

The relevant provision of the Confidentiality Agreement precludes Heritage from bringing a claim based on the Evaluation Material provided to it by the investment banking firm Sperry, Mitchell & Company, LLC:

> You understand that none of the Company's directors, officers, employees, agents, or representatives have made or make any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material. You agree that none of the Company's directors, officers, employees, agents, or representatives shall have any liability to you or any other person resulting from the use or content of the Evaluation Material.

7

(DX 4 at SPM3583). The SPA's integration clause, Section 7.5, preserves the obligations

imposed by the Confidentiality Agreement:

> This Agreement and the Related Agreements constitute the entire agreement between and among the parties hereto and thereto with respect to their collective subject matter and supersede all other prior agreements and understandings, both written and oral, among or between any of such parties with respect to the collective subject matter hereof and thereof; *provided*, this Agreement shall not supersede any existing confidentiality agreements between or among the parties, all of which continue in effect in accordance with their terms.

(PX 4). The SPA also contains a provision, Section 2.28, which expressly disclaims extra-

contractual statements made by Defendant. (*Id.*). That section provides:

> Except for the representations and warranties contained in Section 2 of this Agreement (including the related portions of the Shareholder Disclosure Schedule), the Shareholder, the Company and/or any other Person has not made or does not make any other express or implied representation, either written or oral, on behalf of the Shareholder or the Company (including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Purchaser and its representatives, or in any form in expectation of the transactions contemplated thereby), or as to the future revenue, profitability or success of the Company, or any representation arising from statute or otherwise in law.

(*Id.*).

Delaware courts enforce clear anti-reliance provisions. *See Prairie Capital III, L.P. v.

Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015); *Abry Partners V, L.P. v. F & W Acq.

LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006). However, an enforceable anti-reliance provision

must contain a promise by the plaintiff that it did not rely on extra-contractual statements. *Abry

Partners*, 891 A.2d at 1059. "If parties fail to include unambiguous anti-reliance language, they

will not be able to escape responsibility for their own fraudulent representations made outside of

the agreement's four corners." *Id.*

The SPA does not contain unambiguous anti-reliance language. Though Defendant

disclaimed extra-contractual representations, Plaintiff did not affirmatively promise not to rely

on such representations.  Thus, under Delaware law, SPA§ 2.28 is not an anti-reliance provision.

Therefore, it does not prevent Heritage from successfully asserting a fraud claim based on extra-

contractual representations.

Although the Confidentiality Agreement bars Plaintiff from bringing a claim based on the

content of the Evaluation Material, it does not bar Plaintiff's fraud claim based on

representations made during diligence.  Defendant cites *RAA Management, LLC v. Savage Sports

Holdings, Inc.* for the proposition that "[n]on-reliance clauses in a confidentiality agreement are

intended to limit or eliminate liability for misrepresentations during the due diligence process."

45 A.3d 107, 119 (Del. 2012).  However, Defendant omits the next sentence of that opinion,

which states, "The breadth and scope of the non-reliance clauses in a confidentiality agreement

are defined by the parties to such preliminary contracts themselves."  *Id.*  In *RAA Management*,

the confidentiality agreement provided:

> You [RAA] understand and acknowledge that neither the Company [Savage] nor
> any Company Representative is making **any** representation or warranty, express
> or implied, as to the accuracy or completeness of the Evaluation Material or
> of **any** other information concerning the Company provided or prepared by or for
> the Company, and none of the Company nor the Company Representatives, will
> have **any** liability to you or any other person resulting from your use of the
> Evaluation Material or any such other information. **Only** those representations or
> warranties that are made to a purchaser in the Sale Agreement when, as and if it is
> executed, and subject to such limitations and restrictions as may be specified [in]
> such a Sale Agreement, shall have any legal effect.

*Id.* at 110 (alterations and emphasis in original).  That agreement is distinguishable from the

Parties' Confidentiality Agreement in that it bound the plaintiff to rely only on representations

made in an eventual contract.  It expressly excluded representations made in the materials and

during diligence.  Here, the Confidentiality Agreement precludes reliance on the Evaluation

Materials, but is silent on representations made during due diligence.  Thus, the Confidentiality

Agreement does not bar Plaintiff from pursuing a Delaware common law fraud claim based on statements and representations made during diligence.[1]

Defendant next argues that Plaintiff's fraud claim is duplicative of its breach of contract claim and, therefore, improper bootstrapping. Plaintiff addresses this claim in a single footnote. (D.I. 175 at 2 n.2). It argues that every case Defendant cites establishes that a post-Closing lawsuit may assert fraud claims. Its confidence is misplaced. Delaware courts routinely dismiss fraud claims that seek damages which are identical to the damages alleged for a breach of contract claim. *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 n.70 (Del. Super. Ct. Mar. 13, 2017) (collecting cases). Moreover, a plaintiff's request for punitive damages does not sufficiently distinguish the damages claims to allow a fraud claim to stand. *Id.* at *6. Other than its request for punitive damages, Plaintiff does not distinguish the damages it seeks for each of the claims in this case. (*See* D.I. 168 at 14-25). Therefore, Defendant is correct that Plaintiff is barred from asserting a fraud claim under Delaware law.[2]

Accordingly, I will only assess Defendant's liability for federal securities fraud.

### 2. Rex's Customers

Plaintiff has established by a preponderance of the evidence that Mr. Fontanella made false representations and omitted material facts regarding Rex's customers. During the diligence period, Mr. Fontanella failed to disclose complaints and cancellations which he was receiving

---

[1] The Parties do not address the impact of the anti-reliance provision on Plaintiff's securities fraud claim. The law is clear. "Section 29(a) of the Exchange Act . . . forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b-5." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 180 (3d Cir. 2003). Such provisions do, however, bear on the reasonability of a party relying on the disclaimed extra-contractual statements. *Id.* at 180-81.

[2] Defendant does not cite authority to support extending Delaware's improper bootstrapping rule to federal securities law. I have not independently identified authority that might support such an extension. Thus, I will consider Plaintiff's federal securities fraud claim.

10

from customers. (Tr. 61:15-19, 63:24-64:2, 78:20-79:8, 81:13-20, 350:25-351:17). Mr. Fontanella also omitted from the SPA material information regarding the status of Rex's relationship with key customers. At Closing, Dana had removed four parts from Rex, the Toyota Tacoma project was ending, Ford was concerned with Rex, and Hendrickson had indicated it would reduce business. (Tr. 138:10-139:2). Of particular concern, Dana was moving some of its business to Rex's competitor Welland Forge—a lengthy, difficult and expensive process. (*Id.* at 139:3-5, 406:17-25).

Despite these issues with key customers, Defendant omitted this information during negotiations and represented that all was well. Mr. Fontanella also falsely represented in Schedule 2.13(a) that any disputes were minor and "have been or will be favorably resolved." (PX 5 at REX24299).

Defendant looks to Schedule 2.13(a) to relieve him of liability for the inaccurate customer representations he made in the SPA. Schedule 2.13(a) provides:

> From time to time in the normal course of business, customers [sic] disputes arise regarding the quality of products sold by the Company and have been or will be favorably resolved. To the Shareholder's knowledge, there are currently no such disputes that could reasonably be anticipated to have a Material Adverse Effect on the Company.

Specifically, Defendant argues that the "material adverse effect" language renders the representations made in Schedule 2.13(a) accurate.[3] (D.I. 173 at 19-21). The contract defines "material adverse effect" (MAE) as:

> any state of facts, change, event, effect, occurrence or circumstance that, individually, or in the aggregate . . . has, has had or could reasonably be expected

---

[3] Mr. Fontanella argues that this language was added in response to his disclosure of "issues" with Dana. (D.I. 173 at 21). He cites to PX 89, an email chain addressing the addition of the MAE language, to support his position. However, Mr. Iorillo credibly testified that the MAE provision was directed to minor disagreements, not lost business. (Tr. 552:11-20).

11

to have or give rise to, a material adverse effect on (a) the business, financial condition, or operations of the Company . . . .

(PX 4 at REX24360). Defendant argues that none of the lost parts, individually or in combination, had an MAE on Rex as a whole.

Plaintiff disagrees with Mr. Fontanella's reading of the contract. It argues that the relevant provision for determining Mr. Fontanella' disclosure obligation is Section 2.13(a):

Section 2.13(a) of the Shareholder Disclosure Schedules sets forth a complete and accurate list of the ten (10) largest customers of the Company for the most recent fiscal year. No such customer has within the last twelve (12) months (i) cancelled, materially decreased or otherwise modified, or to the Shareholder's Knowledge, threatened to cancel, materially decrease or otherwise modify its relationship with the Company . . . or (iii) notified the Shareholder or the Company of any dispute of any nature.

I agree with Plaintiff. The MAE clause of Schedule 2.13(a) applies only to "such disputes." "Such disputes" refers to the normal course of business, quality-type disputes which are described in that paragraph. It does not, however, reach all the way back to the language of Section 2.13(a) to limit the scope of Mr. Fontanella's disclosure obligation for all customer related issues. It certainly does not save Mr. Fontanella from liability for failing to mention customers who canceled parts. Such cancellations qualify as "otherwise modified . . . its relationship with the Company." Therefore, the MAE clause does not insulate Mr. Fontanella from the specific omissions and misrepresentations at issue in this case.

Regarding customer relationships, Plaintiff has established by a preponderance of the evidence that Mr. Fontanella acted with scienter as is required for a claim of federal securities fraud. Three facts support my finding. First, early in negotiations, the Parties agreed to decrease the sales price from $15 million to $12 million. (Tr. 45:8-17). The decreased sales price was upsetting to Mr. Fontanella. (*Id.*). It is reasonable to conclude that he was strongly motivated to avoid additional decreases. Second, the record establishes that Mr. Fontanella knew

that loss of business would be unfavorable to the deal. (Tr. 142:15-19). As a seasoned businessman, Mr. Fontanella would have known that trouble with key customers would have been important information to Plaintiff and may have led to a decrease in the sales price. In fact, Plaintiff made it clear to Mr. Fontanella that the customer relations issue was critical by including Section 2.13(a) as a "core rep." (PX 4 at § 6.4; Tr. 444:5-20). A failure of a "core rep" is so serious that it causes a deal to fall apart. (Tr. 451:9-19). Third, Mr. Fontanella kept quiet. Mr. Fontanella's silence as to loss of customers during this key period is highly suspect. Together, Mr. Fontanella's motivation to maintain the $12 million purchase price, his knowledge of the significance of the customers to the deal, and his failure to speak lead to the reasonable inference that he intended to deceive and defraud Plaintiff.

Plaintiff was justified in relying on Mr. Fontanella's statements and representations regarding Rex's customers. During the diligence period, the Parties were focused on discretion so as not to alarm Rex's employees and customers. (Tr. 231:8-24). Therefore, it was reasonable, and necessary, for Plaintiff to rely on what Mr. Fontanella was communicating rather than reaching out to customers itself. In breach of Plaintiff's trust, Mr. Fontanella manipulated the information provided to Plaintiff. For example, Mr. Fontanella hand-selected the one customer contact Plaintiff would have and failed to disclose the many negative signals Rex was receiving from major customers. Given the circumstances of the transaction, Mr. Fontanella's manipulation was effective. Moreover, Mr. Fontanella omitted important information from the SPA about changing customer relationships and misrepresented those relationships in the SPA. Plaintiff cannot be faulted for relying on the representations Mr. Fontanella made in the final sales contract.

As I address more fully below, Mr. Fontanella's misrepresentations harmed Plaintiff by causing it to overpay for Rex.

Thus, Plaintiff has established by a preponderance of the evidence that: (1) Mr. Fontanella sold it a security,[4] (2) Mr. Fontanella made false representations and omissions of material facts related to customer relationships, (3) Mr. Fontanella acted with scienter, (4) Plaintiff justifiably relied on Mr. Fontanella's representations and omissions, and (5) Plaintiff was harmed by relying on Mr. Fontanella's fraudulent representations and omissions. Plaintiff has proven that Mr. Fontanella committed securities fraud under Section 10(b) of the Exchange Act.

### 3. Rex's Equipment

Plaintiff has not established by a preponderance of the evidence that Mr. Fontanella committed fraud by misrepresenting the condition of Rex's equipment.

As an initial matter, Plaintiff has not established that the representation Mr. Fontanella made in SPA § 2.7 as to the condition of the equipment was inaccurate. Section 2.7 states:

> To Shareholder's Knowledge, the property and other assets owned or leased under enforceable Contracts by the Company are in good working condition, ordinary wear and tear excepted, ... and sufficient to permit the Company to conduct its business after the Closing in accordance with past practice.

(PX 4). Whether the equipment satisfied this provision at Closing depends on (1) whether it was in "good working condition" with only "ordinary wear and tear" and (2) whether it was sufficient to permit Rex to conduct business "in accordance with past practice." Plaintiff knew both what it was purchasing and how Mr. Fontanella's team ran Rex's equipment prior to Closing. Specifically, Plaintiff knew it was purchasing an old company with old, heavily used equipment. Plaintiff also knew that the equipment broke down regularly; two of the press cells were broken

---

[4] The security is stock in Rex. The Parties do not address this claim element and it is undisputed.

14

down at the time of the sale. Thus, Plaintiff knew that operation "in accordance with past practice" meant regular maintenance and occasional equipment failures.

Plaintiff did not present reliable evidence of the condition of the equipment as of Closing which would tend to establish that the equipment was not in the condition anticipated by the SPA. Plaintiff relies primarily on the testimony of Rex's current maintenance manager, Justin Jarnigan, to support its position that the equipment was in poor condition at Closing. (D.I. 168 at 12-13). However, Plaintiff hired Mr. Jarnigan about six months after Closing. (Tr. 627:19-21). Prior to working at Rex, Mr. Jarnigan had no experience with forge presses. (Tr. 639:1-10). Although he testified as an expert, and I do not question his sincerity, Mr. Jarnigan's analysis amounted to little more than a *res ipsa loquitur* theory that because the press cells were in poor condition sometime after Closing, they must have been in poor condition at Closing. I did not find Mr. Jarnigan's testimony as to the equipment's condition at Closing convincing, and I therefore give it little weight.

Plaintiff also relies on the testimony of Mark Dudzinski, the former quality manager at Rex, and Joe Futcher, Rex's CEO post-Closing, to establish the condition of the presses at Closing. Both Mr. Dudzinski and Mr. Futcher have only minimal first-hand knowledge of the condition and maintenance of the equipment prior to Closing. Thus, I give their testimony little weight.

Defendant, on the other hand, argues that the condition of the press cells was "good" within the meaning of the SPA. He supports his position by noting that it is not possible to keep a press cell from the 1950s operating without maintaining it. (Tr. 976:5-9). He also notes that the Great American audit report, created by individuals who physically observed the equipment

during the relevant period, said that the equipment was "functional for current uses" and was in "fair working order." (DX 71 at HERITAGE4757).

I find that Plaintiff has not established by a preponderance of the evidence that Mr. Fontanella falsely represented the condition of the equipment as Closing. Plaintiff's evidence is drawn almost exclusively from after-the-fact observations by interested individuals. Defendant's evidence, on the other hand, is contemporaneous to the diligence period and supports a conclusion that the equipment was as Mr. Fontanella represented.

Plaintiff has not established that Mr. Fontanella intended to deceive or defraud Plaintiff as to the condition of the equipment. It would be unreasonable to conclude that Mr. Fontanella, an experienced business person, would believe he could deceive sophisticated business people as to an easily observable, readily verifiable fact. There is no evidence that Mr. Fontanella made any efforts to prevent observation of the equipment. He facilitated walk-throughs, provided Plaintiff with maintenance records, and gave Plaintiff access to his staff. He made them aware of the fact that two of the eight presses were out of service at Closing. (PX 5 at REX24271). On balance, the record supports a conclusion that Mr. Fontanella intended to allow Plaintiff to make an informed decision as to the condition of the press cells.

Plaintiff has not established that it was reasonable to rely on any representation Mr. Fontanella made regarding the equipment. Unlike the customers, the equipment could not be scared off by talks of a sale and was easily observable. Plaintiff was a sophisticated purchaser of businesses generally similar to Rex and had a self-described "eyes wide open" approach to transactions. (DX 19). Plaintiff knew the equipment was old, knew that the age made it more prone to breaking down, and had access to maintenance records. Moreover, Plaintiff's own appraiser, Great American, noted that the equipment had seen hard use. (DX 71 at

HERITAGE4748, 4771-88). With so many sources of information indicating the risk associated with the equipment, Plaintiff should have independently informed its understanding of the equipment's condition.

Moreover, as to damages, the events following the transaction support a conclusion that equipment failures and unexpected maintenance expenses were, at least partially, due to changes in the staff and mismanagement by the Heritage team.

Plaintiff has failed to prove by a preponderance of the evidence that Mr. Fontanella made a false representation, that Mr. Fontanella intended to induce Plaintiff to act via a representation, that Plaintiff was justified in relying on a representation, or that the capital expenditures it was required to make after Closing were caused by a misrepresentation made by Mr. Fontanella. Thus, Plaintiff has failed to prove that Mr. Fontanella committed fraud regarding the condition of Rex's equipment.

## III.  PLAINTIFF'S BREACH OF CONTRACT CLAIM

### A.  Legal Standard

Under Delaware law, to prevail on a breach of contract claim, a plaintiff must establish the existence of a contract, a breach of an obligation imposed by that contract, and damages caused to the plaintiff by the breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

### B.  Discussion

Mr. Fontanella breached his contract with Heritage by falsely representing that none of the top ten customers had modified its relationship with Rex in the preceding 12 months. In Section 2.13(a) of the SPA, Mr. Fontanella represented:

> Section 2.13(a) of the Shareholder Disclosure Schedule sets forth a complete and
> accurate list of the ten (10) largest customers of [Rex] for the most recent fiscal
> year. No such customer has within the last twelve (12) months (i) cancelled,

17

materially decreased or otherwise modified, or to [Mr. Fontanella's] Knowledge, threatened to cancel, materially decrease or otherwise modify its relationship with [Rex], (ii) materially delayed or postponed any payment owed to [Rex] or (iii) notified [Mr. Fontanella] or [Rex] of any dispute of any nature.

(PX 4). SPA § 6.4 lists § 2.13(a) as a "Core Rep," which means a claim based on that section remains viable until the expiration of the statute of limitations.[5]   Pursuant to Section 2.13(a), Mr. Fontanella provided Heritage with Schedule 2.13(a) which lists Rex's ten largest customers and includes the MAE provision. (PX 5 at REX 24299).

As I explain above, Rex's primary customers, Dana and Hendrickson, were pulling parts from Rex during the period leading up to Closing. The customers' actions qualify as "otherwise modify[ing]" their relationship with Rex and threatening to materially decrease their relationship with Rex. Thus, Mr. Fontanella breached this portion of the SPA. As I explain more fully below, Mr. Fontanella's breach caused Plaintiff harm by causing Plaintiff to overpay for Rex.

As I also explain above, Plaintiff has not established that Mr. Fontanella misrepresented the condition of the equipment in the SPA. The evidence tending to prove that the equipment was not in "good working condition" such that Rex could "conduct its business after Closing in accordance with past practice" is weak, while the evidence supporting that representation is persuasive. Thus, I find Plaintiff has not proven by a preponderance of the evidence that Mr. Fontanella breached SPA § 2.7.

## IV.   PLAINTIFF'S DAMAGES

### A. Legal Standard

Damages for Section 10b-5 fraud are normally calculated as the difference between the price paid for the security and the security's actual value. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991) (noting that other measures of damages may also be appropriate).

---

[5] The other representations and warranties expired six months after closing. (PX 4 at ¶ 6.4).

The actual value of a security is "the value which the market would have assigned to the stock had there been no wrongdoing on the part of the defendants." *Id.* at 297-98. A plaintiff may also recover consequential damages that result from the defendant's wrongdoing. *McLean v. Alexander*, 449 F. Supp. 1251, 1268 (D. Del. 1978), *rev'd on other grounds*, 599 F.2d 1190 (3d Cir. 1979). To receive consequential damages, "the plaintiff must establish with reasonable certainty that those damages result directly from defendant's wrongdoing." *Id.* Consequently, "capital contributions and other expenses of attempting to save [the business] may be recoverable." *Madigan, Inc. v. Goodman*, 498 F.2d 233, 239 (7th Cir. 1974); *see also McLean*, 449 F. Supp. at 1269 (awarding buyer consequential damages for $100,000 capital infusion into the business).

The remedy for breach of contract is measured by the reasonable expectations of the parties at the time of contracting. *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). "This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Id.*

B. *Relevant Factual Findings*

1. The $12 million purchase price for Rex was derived by calculating Rex's historical trailing twelve month ("TTM") earnings before interest, taxes, depreciation, and amortization ("EBITDA") and multiplying it by a 3.3 deal multiple. (Tr. 764:6-23). A deal multiple represents the inherent risk to the investment; a lower multiple represents higher risk and a higher multiple represents lower risk.

2. Rex's historical TTM EBITDA, prior to the sale, was $3,662,209. (PX 122).

3. The lost parts resulted in a $500,000 decrease in TTM EBITDA. (Tr. 824:11-825:11, 836:23-837:16).

4. The working capital adjustments which the Parties made post-Closing were the result of Mr. Fontanella wiring himself $1.6 million more than he should have from Rex's bank account. (Tr. 1161:4-1163:2).

5. Mr. Fontanella received the amount he was due under the SPA. (Tr. 602:7-604:11, 624:18-625:13, 1162:6-1163:2, 1203:9-17).

6. Mr. Fontanella's fraud and breach of contract caused Plaintiff $4.4 million in damages.

*C. Discussion*

The Parties dispute the sales price which Heritage paid for Rex at Closing. Heritage argues that it paid the $12 million purchase price found in the SPA. Mr. Fontanella alleges that the $12 million figure does not represent adjustments made at and after Closing and the $2.5 million Note. (D.I. 173 at 24). His position is that Heritage has paid him only $7,866,000. (*Id.* at 12).

Mr. Fontanella's position is not supported by the record. I find that the working capital adjustments were the result of Mr. Fontanella wiring himself $1.6 million more than he was entitled to from Rex's bank account. (Tr. 1161:4-1163:2). I also find that, although Heritage has not handled the Note as required by the SPA, Mr. Fontanella was given a $2.5 million Note at Closing. (DX 137). Therefore, Mr. Fontanella received $12 million for Rex—the amount he was due under the SPA. (Tr. 602:7-604:11, 624:18-625:13, 1162:6-1163:2, 1203:9-17). Thus, $12 million is the appropriate starting point for the damages analysis.

Plaintiff presents six damages calculations, each using a slightly different methodology. (D.I. 168 at 17-21). Its proposed damages figures range from $4.4 million to $6 million. (*Id.*). It does not indicate which of the methodologies or damages figures it believes is correct.

Plaintiff leads with Eric Willis's damages analysis. (D.I. 168 at 17-19). Mr. Willis is a CPA with experience in auditing, mergers, and acquisitions. (Tr. 753:6-14). He is the CounterPoint Partner responsible for financials and earnings evaluations. (Tr. 753:15-23). Mr. Willis testified that he calculated that the lost parts would lower Rex's TTM EBITDA by $900,000, to $2.8 million. (Tr. 768:13-769:15). He also testified that CounterPoint, had it known of lost business, would have accounted for the root cause of the losses by either factoring the risk into the historical TTM EBITDA or the deal multiple. (Tr. 774:5-23). According to Mr.

Willis, CounterPoint would have reduced either the TTM EBITDA by an additional 30% or the deal multiple by 30%. (Tr. 774:24-778:7). Mr. Willis calculated that the resulting numbers would be either a TTM EBITDA of $1.9 million or a deal multiple of 2.4. Plaintiff argues that under either calculation, the purchase price would be reduced by approximately $6 million. (D.I. 168 at 18).

I am not persuaded by Mr. Willis's testimony and I do not find it very credible. Mr. Willis, a partner in the company that owns Plaintiff, is a highly interested witness. He stands to benefit personally from any damages I may award. And, not surprisingly, his calculations result in damages figures which are generally larger than those proposed by Plaintiff's hired expert. Due to Mr. Willis's bias, I will not consider his testimony when deciding on the appropriate damages award.

Plaintiff hired Jaime D'Almeida from the valuation firm Duff & Phelps to provide an expert opinion of the appropriate purchase price for Rex. (*Id.* at 19). He applied four approaches to valuing Rex: two income-based approaches and two market approaches. (*Id.*).

In his two income-based approaches, Mr. D'Almeida considered increased capital expenditure requirements. (*Id.* at 19, 21). I have found that Mr. Fontanella is not liable for those equipment related expenses and will therefore disregard Mr. D'Almeida's income-based evaluations.

In his first market-based approach, Mr. D'Almeida calculated the value of Rex by considering, among other things, the removal the Wells Fargo term loan. (*Id.* at 19-20; Tr. 835:4-20). Applying this approach, Mr. D'Almeida calculated an adjusted purchase price of $6.8 million which would mean damages of $5.2 million. (Tr. 836:11-837:24 (calculating a 2.1 or 2.2 deal multiple and a decrease in TTM EBITDA of $500,000)). The record is unclear on the

extent to which the loss of the term loan relates to issues Plaintiff had with the equipment. (*See* D.I. 168 at 22). Due to this lack of clarity, I give Mr. D'Almeida's first market-based approach less weight.

In his second market-based approach, Mr. D'Almeida utilized historical data to factor the increased risk into the purchase price. (Tr. 838:19-840:4). This method did not include increased capital expenditures or the loss of the term loan. (Tr. 842:12-20, 869:20-22). Applying this approach, Mr. D'Almeida calculated an adjusted purchase price of $7.6 million which would mean damages to Plaintiff of $4.4 million. (Tr. 842:8-11). I find Mr. D'Almeida's second market-based approach the most reliable out of all Plaintiff's proposed damages figures as it is not tied to the equipment issues for which Mr. Fontanella is not liable.[6]

Defendant also presented a damages expert, Brett Margolin. Mr. Margolin accepted Mr. D'Almeida's $500,000 reduction in TTM EBITDA. (Tr. 1210:15-18). However, Mr. Margolin testified that the issues with Rex's customers would represent only a *de minimis* additional risk to an investor. (Tr. 1213:11-25). That position is not credible. The Parties agree that 80% of Rex's business was with a single company, Dana. During the relevant period, Dana was sending clear signs of discontent to Rex. It defies belief that a reasonable investor, when presented with

---

[6] Mr. Fontanella objects to the basis of Plaintiff's damages analysis. (D.I. 173 at 22-24). He argues that the expert's opinions are based on what Plaintiff would have subjectively paid. (*Id.* at 23). The record may support such a conclusion for Mr. Willis's analysis. However, Mr. D'Almeida completed an independent evaluation to arrive at a transaction price. (Tr. 884:22-885:9.). His methodology is also consistent with approaches other courts have approved. (*See* D.I. 168 at 16 (summarizing *Cobalt Operating, LLC v. James Crystal Enterprises, LLC*, 2007 WL 2142926 at *16-29 (Del. Ch. July 20, 2007)).

Mr. Fontanella also objects to the expert's method for calculating the decrease in TTM EBITDA. (*Id.* at 24). I do not see an issue with Mr. D'Almeida's approach. He calculated the lost parts reduction by considering the sale of those parts for the previous three years. (Tr. 824:11-825:11, 836:23-837:16).

all the facts, would view the risk of the situation as *de minimis*. Moreover, Defendant does not mention Mr. Margolin's opinion in his brief. I do not give Mr. Margolin's testimony any weight.

Thus, having considered the six damages calculations presented by Plaintiff's and Mr. Fontanella's experts, I find that Mr. D'Almeida's second market-based approach most closely aligns with my findings and is most credible. I will award Plaintiff $4.4 million.[7]

Plaintiff requests an award of prejudgment interest calculated from July 31, 2015 at a rate of 5% (the legal rate) and compounded quarterly. (D.I. 168 at 23). In Delaware, "[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988). It appears that Plaintiff's request is consistent with the approach taken by Delaware courts. *See In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, at *33 (Del. Ch. Aug. 18, 2006); *Cobalt Operating, LLC v. James Crystal Enterprises, LLC*, 2007 WL 2142926, at *31 (Del. Ch. July 20, 2007). Thus, I find that Plaintiff's request is reasonable. I will award it interest on its proposed terms.[8]

---

[7] Plaintiff requests between $6,832,449 and $7,232,449 in damages for the expense of repairing and maintaining equipment after Closing. (D.I. 168 at 21-22). However, Mr. Fontanella did not commit fraud or breach the SPA regarding the condition of the equipment. Thus, I will not award damages for equipment-related expenses.

Plaintiff also seeks $1,025,000 in damages for its default on its loan with Wells Fargo. (*Id.* at 22). Plaintiff attributes its loan default to Rex's failure to meet two loan covenants: the Fixed Charge Coverage Ratio (FCCR) covenant and the Minimum EBITDA test. (*Id.*). For both covenants, Plaintiff ascribes the failure, in part, to the equipment. (*Id.*). Mr. Fontanella, however, is not liable for damages resulting from equipment failure. Thus, Plaintiff's analysis does not provide me enough basis to determine what portion of the default is attributable to Rex's lost business. I will not award Plaintiff damages for its default on the Wells Fargo loan.

[8] Mr. Fontanella states, without argument or support, that "Heritage has engaged in self-help by not paying principal or interest due on the Note; its request for prejudgment interest should be denied." (D.I. 173 at 25). There is not a basis in the record to find that Plaintiff's actions relative to the Note were self-help. Thus, I will not deny Plaintiff's request on this basis.

23

Plaintiff also requests that I award it punitive damages for its fraud claim. (D.I. 168 at 23-25). However, punitive damages are unavailable for violations of the federal securities laws. *Straub v. Vaisman & Co.*, 540 F.2d 591, 599 (3d Cir. 1976). I have dismissed Plaintiff's common law fraud claim and found liability only under the federal securities laws. Thus, I will deny Plaintiff's request.

Thus, for Mr. Fontanella's fraud and breach of contract, I will award Plaintiff $4,400,000 in damages plus prejudgment interest at a rate of 5% compounded quarterly.[9]

## V. DEFENDANT'S REQUEST FOR REFORMATION OF SECTION 4.1 OF THE SPA

### A. Legal Standard

"Under Delaware law, contract interpretation is a question of law." *JFE Steel Corp. v. ICI Americas, Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011). "If the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document." *Id.*

When faced with a clear drafting mistake, however, a court may reform a written agreement to reflect the parties' actual understanding at the time of contracting. *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 677 (Del. 2013). "Reformation is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done." 27 Williston on Contracts § 70:19 (4th ed.). To succeed on a claim for reformation, the proponent must prove a drafting error by clear and convincing evidence. *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del.

---

[9] Mr. Fontanella argues that the doctrine of unclean hands should bar Plaintiff's recovery. (D.I. 173 at 25). Although I do find that Plaintiff has breached the SPA, I do not find its conduct so shocking as to warrant invoking the doctrine. Mr. Fontanella also requests that I offset any damages award against the Note. (*Id*). I do not find that Plaintiff has given up its right to offset environmental compliance expenses under the Note. Thus, I will deny this request.

24

2002). The clear and convincing evidence standard is met when, after considering all the evidence adduced at trial, the finder of fact holds an abiding conviction that the proponent's position is truthful and the contract as reformed was the parties' true agreement. *Id.* at 1153.

A party can establish a claim for reformation via either a mutual mistake theory or unilateral mistake theory. *Id.* at 1151. Under the doctrine of mutual mistake, "the plaintiff must show that both parties were mistaken as to a material portion of the written agreement." *Id.* Under the unilateral mistake theory, the party "must show that it was mistaken and that the other party knew of the mistake but remained silent." *Id.*

### B. *Relevant Factual Findings*

1. The Parties made a mutual mistake as to the content of SPA § 4.1(d).

2. The Parties' actual agreement was that Mr. Fontanella would receive any tax refund attributable to the period prior to Closing.

3. Mr. Thomas Candrick credibly testified that he amended the SPA with the intention of clarifying that any tax refund attributable to the period prior to Closing would go to Mr. Fontanella. (Tr. 1078:18-1080:11).

4. Mr. Fontanella did not intend to overpay taxes prior to Closing. (Tr. 1158:2-10).

5. SPA § 4.1(d) contains an additional unnoticed error – in the third line "parties" should have been "portions."[10] (Tr. 1084:10-16).

6. The Parties failed to notice the mistakes in SPA § 4.1(d) in the numerous drafts that they exchanged. (PX 66, 68, 70, 72, 73, 75, 76, 84, 85, 86, 89, 91, 93 and 94).

### C. *Discussion*

The evidence supports reforming the SPA to reflect the Parties' intent that any tax refund would go to Mr. Fontanella. The SPA sets out a straightforward plan for the payment of taxes— Mr. Fontanella was liable for pre-Closing taxes and Heritage would pay all post-Closing taxes. (PX 4 at §§ 4.1(a)-(c)). Section 4.1(d), the provision addressing tax refunds, by its plain

---

[10] Or, possibly, "parts," which would have the same impact.

language provides that any tax refund for overpayment of pre-Closing taxes should go to Heritage:

> Any tax refunds received by [Rex] and any amounts credited against Taxes to which [Rex] and [Heritage] become entitled, that relate to Tax periods or parties [sic] of Tax periods ending on or before the Closing Date shall be for the account of [Mr. Fontanella] and [Rex] shall pay to [Heritage] any refund or the amount of any such credit as this fifteen (15) days after receipt by [Rex] or [Heritage].

(PX 4). Mr. Fontanella aptly identifies the clear disconnect between stating that the refund would be "for the account of" Mr. Fontanella and, in the same breath, assigning that money to Heritage. (D.I. 169 at 14).

The evidence at trial established that Thomas Candrick, Mr. Fontanella's attorney for the sale of Rex, added Section 4.1(d) to clarify that any tax over-payment should be returned to Mr. Fontanella. (Tr. 1078:24-1079:8). Mr. Candrick stated that he commonly includes such provisions in stock purchase agreements. (Tr. 1079:9-1080:13).

Mr. Candrick also testified to the meaning of a handwritten note on a contemporaneous draft of the SPA. (PX 213 at SPM 5756). A note written next to SPA § 4.1 states, "Pre-closing tax refunds to Rex Forge." (Id.). Mr. Candrick testified that this note was meant to remind him to include a provision dealing with a potential pre-Closing tax refund which would give any potential refund to Mr. Fontanella. (Tr. 1078:24-1079:2).

Section 4.1(d) should have returned the pre-Closing tax refund to Mr. Fontanella. Clear and convincing evidence supports finding that the SPA's language was a mutual mistake. Several facts support my conclusion. Regarding Mr. Candrick's handwritten note, at the time of the transaction, Rex Forge was Mr. Candrick's client. It is logical that his notes would have indicated "pre-closing tax refunds to [my client]." Given the status of his relationship with the Parties at the time of the note, I credit Mr. Candrick's testimony on what he meant. Moreover, Mr. Candrick added the tax refund provision. This fact supports the conclusion that he meant the

26

provision to benefit his client. Finally, the provision says that the refund should benefit Mr. Fontanella, further supporting Mr. Candrick's clear intent when drafting the section. I also note that it does not make sense that the SPA would include a provision requiring the purchaser to pay itself money it already possesses.

For all these reasons, I find that Mr. Fontanella has met the requirements for reformation. I will reform Section 4.1(d) to reflect the Parties true intent:

> Any tax refunds received by [Rex] and any amounts credited against Taxes to which [Rex] and [Heritage] become entitled, that relate to Tax periods or portions of Tax periods ending on or before the Closing Date shall be for the account of [Mr. Fontanella] and [Rex] shall pay to [Mr. Fontanella] any refund or the amount of any such credit as this fifteen (15) days after receipt by [Rex] or [Heritage].

## VI. DEFENDANT'S BREACH OF CONTRACT CLAIMS

### A. *Section 4.1(d)*

#### 1. Relevant Factual Findings

1. Rex received a federal tax refund in August 2016. (DX 181).

2. Heritage has not paid Mr. Fontanella any pre-Closing tax refund.

3. The Connecticut State tax refunded for the period prior to Closing was $77,193. (DX 225).

4. The Federal tax refunded for the period prior to Closing was $363,344. (DX 225).

5. The Parties intended to resolve the tax refund issue after the net working capital adjustment was finalized. (Tr. 1129:19-25, 1089:10-25, 1091:2-8; DX 150).

6. Joseph Polzella's methodology for calculating the amount of the tax refund attributable to the pre-Closing period established the amount to a reasonable probability. (DX 225).

#### 2. Discussion

Heritage is in breach of SPA § 4.1(d). As reformed, Section 4.1(d) requires Heritage to pay Mr. Fontanella any tax refund that was attributable to the pre-Closing period within 15 days of receipt. It did not fulfill that obligation. Therefore, absent an affirmative defense by Heritage,

Mr. Fontanella is entitled to receive the $440,537 in pre-Closing taxes which were refunded to Heritage.

Plaintiff argues that a settlement agreement ("NWC Agreement") which the Parties entered to resolve the net working capital adjustment bars Mr. Fontanella's claim. (D.I. 172 at 19-21). The NWC Agreement includes a broad release provision:

> The Shareholder . . . does hereby release and forever discharges the Purchaser . . . of and from any and all claims, demands, damages, debts, liabilities, actions and causes of action of every kind and nature whatsoever, in law or equity, whether now known or unknown, which the Shareholder ever had, or now has, against the Released Purchaser Parties, arising out of, based upon, or in connection with, any adjustment to the Cash Purchase Price pursuant to Section 1.3 of the Purchase Agreement.

(PX 107 at HERITAGE16005).

On its face, this provision does not bear on tax liability issues found in Section 4.1(d). Plaintiff, however, argues that Mr. Fontanella brought the tax refund within the scope of the release by raising the issue during settlement negotiations and by relying on the settled working capital adjustments to calculate the amount of the tax refund. (D.I. 172 at 20).

I am not persuaded by Plaintiff's argument that mentioning a right to a tax refund during the same period as a negotiation on a different portion of the SPA renders the tax refund part of the settlement agreement. I also do not agree with Plaintiff's argument that calculating the tax refund from the finalized net working capital numbers renders the claim "based upon" the "Cash Purchase Price pursuant to Section 1.3." The plain language of the provision limits it to challenges related to SPA § 1.3 titled "Adjustment to Purchase Price." Mr. Fontanella's entitlement to the pre-Closing tax refund is unrelated to the purchase price; it stems from Section 4.1 titled "Tax Matter." Thus, Mr. Fontanella did not release his claim to the tax refund.

Plaintiff next argues that Mr. Fontanella's claim to a tax refund should be barred by the doctrine of unclean hands based on his fraudulent representations in inducing the contract. The

28

doctrine of unclean hands is, as a general rule, an equitable defense invoked to deny a party equitable relief. "The defense of 'unclean hands' is generally inappropriate for legal remedies." *USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 20 n.16 (Del. Super. Ct. 2000). However, courts have broad discretion when deciding whether to apply the doctrine and have become more flexible with the distinction between law and equity. *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999); *USH Ventures*, 796 A.2d at 19.

I do not find that Mr. Fontanella's claim to a pre-Closing tax refund should be barred by the doctrine of unclean hands. Mr. Fontanella's claim is a legal claim and, thus, not a likely candidate for the application of the doctrine. Moreover, Plaintiff has succeeded on its legal claims against Mr. Fontanella and its damages award will compensate it for any harm done by Mr. Fontanella. An application of unclean hands in this case would amount to a double recovery for Plaintiff, an inequitable outcome.

Mr. Fontanella did not waive his claim and his claim is not barred by the doctrine of unclean hands. Therefore, I will enter judgment in favor of Mr. Fontanella on this counterclaim and award Mr. Fontanella $440,537 in damages plus prejudgment interest at a rate of 5% compounded quarterly for Heritage's breach of contract.[11]

*B. Section 4.1(c) and Sections 2 & 8 of the Compliance*

### 1. Relevant Factual Findings

1. Heritage did not set up a reserve account for environmental remediation. (Tr. 569:6-9).

2. Heritage did not provide Mr. Fontanella with documentation of environmental remediation expenses on a quarterly basis. (Tr. 569:10-12).

---

[11] Mr. Fontanella requests attorneys' fees pursuant to SPA § 6.2(b). (D.I. 169 at 23). The request is premature. This issue is appropriately raised only in a motion pursuant to Federal Rule of Civil Procedure 54(d) after I enter judgment in this case.

3. Heritage kept Mr. Fontanella reasonably appraised of environmental remediation activities after Closing. (Tr. 569:13-570:7).

4. Heritage has provided all environmental compliance documents to Mr. Fontanella. (Tr. 570:2-571:3).

### 2. Discussion

Mr. Fontanella argues that he is "entitled to a declaration that Heritage breached Section 4.1(c)." (D.I. 169 at 20). SPA § 4.1(c) deals with Mr. Fontanella's right to review the tax return for the taxable period ending after Closing. (PX 4). Mr. Fontanella does not identify any information he is currently missing or any harm that resulted from a delay in his receiving the information. (D.I. 169 at 19- 20).

The Court tries not to be in the business of issuing meaningless declarations on mooted issues. *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997). Mr. Fontanella received the tax return documents during this litigation and has had the opportunity to review them. (D.I. 169 at 20). That is all he was entitled to under the SPA and he has not alleged any harm from the delay. Thus, my declaring a breach will do nothing. Mr. Fontanella's claim for breach of Section 4.1(c) is dismissed as moot.

Mr. Fontanella's final two counterclaims relate to the "Compliance" found in Exhibit B of the SPA. (PX 4). The Compliance addresses Rex's environmental remediation obligations following the sale. Section 2 of the Compliance sets out Plaintiff's obligation to keep Mr. Fontanella informed of remediation activities:

> The Purchaser and the Company shall keep the Shareholder reasonably apprised of the progress of any material and necessary Activities conducted in accordance with the requirements herein.

(PX 4 at Exh. B). Section 8(c) sets out the requirement that Plaintiff provide Mr. Fontanella with quarterly updates, starting three months after Closing, which (1) evidence the amount of funds deposited or withdrawn from the Reserve Account, and (2) provide supporting documentation

detailing the use of the funds in connection with remediation activities. Section 8(c) assumes that Plaintiff has created a Reserve Account per Section 8(a).

Mr. Fontanella requests an injunction pursuant to Sections 2 and 8 of the Compliance which: (1) requires Plaintiff to provide him with all past and future information detailing the progress of compliance activities and (2) requires Plaintiff to provide information regarding the Reserve Account and detailing the funding of environmental compliance activities. (D.I. 168 at 20-21). He also requests a declaration that, due to its breach, Heritage is not entitled to a set-off against the Note under SPA § 6.6.

Mr. Fontanella's explanation of how any Section 2 informational deficiencies harmed him is wanting. He alleges generally that Heritage's failure to provide him with the information has prevented him from monitoring and disputing Heritage's use of the Reserve Account funds. (D.I. 175 at 9). It is, however, undisputed that Mr. Fontanella received all the compliance activity information that was available during this litigation. It is also undisputed that Heritage has undertaken environmental compliance activities. Given that, Mr. Fontanella's failure to identify even one compliance activity which he might have timely challenged is seriously puzzling. I find that Heritage met its obligation under Compliance § 2 by providing Mr. Fontanella with all documentation related to environmental remediation. I also find that Mr. Fontanella has not established any harm due to a delay in receiving such documentation.

It is true, however, that Mr. Fontanella was and is entitled to quarterly updates on the status of a Reserve Account through the expiration of the Note under Compliance § 8(c). Mr. Fontanella has proven that Heritage has not provided him with such updates. He has also proven that Heritage has failed to establish a reserve account at all. Plaintiff's failure to provide information detailing the use of Reserve Account funds is a breach of the SPA. Mr. Fontanella is

harmed by not having the information to which he is contractually entitled. Thus, Mr. Fontanella has proven a claim for breach of the SPA.

Given the nature of Heritage's contractual breach, however, it is not reasonable to find that Heritage has forfeited its set-off rights under SPA § 6.6 as Mr. Fontanella requests. There is no evidence in the record that Heritage retains possession of money to which Mr. Fontanella is entitled. Rather, I will enter an order requiring Heritage to set up a reserve account and to provide Mr. Fontanella with documentation evidencing deposits and withdrawals from the account on a quarterly basis going forward. I will also require Heritage to provide Mr. Fontanella with all documentation, organized by quarter, showing expenses that would have been drawn from the Reserve Account had it existed since Closing.

## VII.    CONCLUSION

Plaintiff has proven by a preponderance of the evidence that Mr. Fontanella committed securities fraud under Section 10(b) of the Exchange Act and breached the SPA by misleading Plaintiff about Rex's customer relationships. Plaintiff has proven damages related to Mr. Fontanella's fraud and breach in the amount of $4.4 million plus prejudgment interest at a rate of 5% compounded quarterly. However, Plaintiff's Delaware common law fraud claim is blocked by Delaware's improper bootstrapping rule. Plaintiff failed to prove Mr. Fontanella committed fraud or breached the SPA by misrepresenting the condition of Rex's equipment.

Mr. Fontanella has proven by clear and convincing evidence that Section 4.1(d) of the SPA contains a drafting error. Mr. Fontanella has further proven, by a preponderance of the evidence, that Plaintiff breached its obligation under reformed Section 4.1(d) by failing to pay Mr. Fontanella the portion of the tax refund that was attributable to the pre-Closing period. Mr. Fontanella has proven that he is entitled to a repayment of $440,537 plus prejudgment interest at a rate of 5% compounded quarterly. Mr. Fontanella has also proven by a preponderance of the

evidence that Plaintiff breached its informational obligations under Section 8 of the Compliance. However, Mr. Fontanella failed to prove that he was harmed by breach of Section 4.1(c) of the SPA or breach of Compliance Section 2.

Within seven days the Parties shall submit an agreed upon form of final judgment consistent with this Memorandum Opinion.